IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Ricardo Sanchez Hooks, | ) | Civil Action No.2:12-cv-305-MGL-BHH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| Eileen Delany, *Unclassified Duty*; | ) | |
| Richard Frierson, *Physician*; Beverly | ) | |
| A. Woods, *Psychiatrist*; James Blake | ) | |
| Gordon, *Human Service Coordinator*; | ) | |
| Jim Page, *Head Supervisor of Gilliam* | ) | |
| *Psychiatric Hospital*; Kanisha Miller, | ) | |
| *Human Service Coordinator*; and Ralph | ) | |
| C. Pollock, *Psychiatrist*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The Plaintiff, a state prisoner proceeding pro se, brought this action pursuant to Title 42, United States Code, Section 1983. This matter is before the Court upon several motions: (a) a Motion for Summary Judgment filed by Defendants Delany, Woods, Gordon, Page, Miller, and Pollock (Dkt. No. 37)[1]; (b) Defendants' Motion to Stay Discovery (Dkt. No. 40); (c) Plaintiff's Motion to Compel (Dkt. No. 42); (d) Plaintiff's Motion to Strike Defendants' Motion to Stay (Dkt. No. 43); and (e) Frierson's Motion for Summary Judgment (Dkt. No. 58).

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1) and Local Rule 73.02(B)(2)(e), D.S.C., all pretrial matters in cases involving *pro se* litigants are referred to a United States Magistrate for consideration.

---

[1]This particular motion was filed by all remaining Defendants except Dr. Frierson. (Dkt. No. 37.) For ease of reference, the undersigned will refer to these moving Defendants simply as "Defendants." The undersigned will refer to Defendant Richard Frierson, *Psychiatrist*, herein as "Frierson." In referring to "all Defendants," the undersigned refers to Defendants and Dr. Frierson.

The Plaintiff brought this action on or about January 27, 2012. (See Dkt. No. 1.) On July 19, 2012, Defendants filed a Motion for Summary Judgment. (Dkt. No. 37.) By order filed July 20, 2012, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), the Plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 38.) Defendants filed a Motion to Stay Discovery on July 20, 2012. (Dkt. No. 40.) In addition to filing a Response in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 54), Plaintiff filed a Motion to Compel (Dkt. No. 42) and a Motion to Strike Defendants' Motion to Stay Discovery (Dkt. No. 43). Frierson filed a Motion for Summary Judgment on November 5, 2012. (Dkt. No. 58.) By order filed November 5, 2012, again pursuant to Roseboro, the Plaintiff was advised of the dismissal procedure and the possible consequences if he failed to adequately respond to the motion. (Dkt. No. 59.) Plaintiff's Response to Frierson's motion was due on December 10, 2012, but Plaintiff did not respond to Frierson's motion. (See id.)

## PROCEDURAL FACTS

Plaintiff, who is currently housed at Perry Correctional Institution ("PCI" or "Perry"), alleges claims pursuant to 42 U.S.C. § 1983. Plaintiff claims that he received constitutionally deficient mental health care from October of 2010 until the time he filed his Complaint. (See generally Dkt. No. 1.) Plaintiff alleges that he suffers from mental illness and has mutilated himself on several different occasions during the time period in question. (Id.) He complains that, despite a trip to Gilliam Psychiatric Hospital ("GPH"), he returned to PCI without any medication. (Dkt. No. 1 at 3 of 7.) Plaintiff further states that he has attempted suicide several times while incarcerated at PCI. (See Dkt. No. 1.) Plaintiff alleges that a "risk of suicide is a serious medical need for the purposes of the Eighth Amendment" and that Defendants' "failure to treat [Plaintiff's] condition resulted in further significant

2

injury/unnecessary wanton infliction of pain." (Id. at 7 of 7.) In the "Relief" section of his Complaint, Plaintiff seeks, *inter alia*, compensatory and punitive damages. (Id.)

## APPLICABLE LAW

**Summary Judgment Motion Standard**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" Id. (quoting Hunt v. Cromartie, 526 U.S. 541, 552 (1999)); see also Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).

## DISCUSSION

As noted above, Defendants and Frierson have moved for summary judgment; they contend they are entitled to summary judgment because, *inter alia*, Plaintiff "has failed to establish a claim that arises to the level of a constitutional violation with regards to medical or mental health care." (Dkt. No. 37-1 at 3 of 19; Dkt. No. 58-1 at 4 of 20.) The undersigned agrees that there are no genuine issues of material fact, and no reasonable jury could find that any Defendant was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, the undersigned recommends granting Defendants' Motion for Summary Judgment and granting Frierson's Motion for Summary Judgment. (Dkt. No. 37; Dkt. No. 58.)

3

In <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." <u>Estelle</u>, 429 U.S. at 104 (internal citations omitted). To prevail on an Eighth Amendment deliberate indifference claim, "a prisoner must prove two elements: (1) that objectively the deprivation of a basic human need was sufficiently serious, and (2) that subjectively the prison officials acted with a sufficiently culpable state of mind." <u>Johnson v. Quinones</u>, 145 F.3d 164, 167 (4th Cir. 1998) (internal quotation marks and citations omitted). The first element "is satisfied by a serious medical condition," while the second element "is satisfied by showing deliberate indifference by prison officials." <u>Id</u>. It is well-settled that mere negligence does not constitute deliberate indifference. <u>Estelle</u>, 429 U.S. at 105-06; <u>Grayson v. Peed</u>, 195 F.3d 692, 695-96 (4th Cir. 1999); <u>Wright v. Collins</u>, 766 F.2d 841, 849 (4th Cir. 1985) (holding that "[d]isagreements between an inmate and a physician over the inmate's proper medical care" are not sufficient to raise an Eighth Amendment claim pursuant to § 1983).

Defendants attached the Affidavit of Beverly Wood, a psychiatrist employed with the South Carolina Department of Corrections ("SCDC"), to their Motion for Summary Judgment; Dr. Wood attached a copy of Plaintiff's medical records from October 2010 to January 2012 to her Affidavit as Exhibit A. (Dkt. No. 37-2.; <u>see also</u> Wood Aff. Ex. A.) In her Affidavit, Dr. Wood states that, during the relevant time, Plaintiff was housed primarily at PCI but had "periods of treatment" at the Gilliam Psychiatric Hospital. (Wood Aff. ¶ 5.) She further stated therein,

> 7)    The Plaintiff has been diagnosed with antisocial personality disorder. There are also several notes in the Plaintiff's medical records where it appears he is malingering. The Plaintiff has a long history of self-injurious behavior.

4

8)     During the relevant time period, mental health treatment was routinely provided to the Plaintiff. This included routine evaluations by Eileen Delany, NP. Also during this time, the Plaintiff was seen on occasion by Dr. Ralph Pollock, James Blake Gordon, Kanisha Miller, and myself for issues relating to his mental health.

9)     Based upon my review of Plaintiff's medical records, it is clear that he has received substantial amounts of mental health treatment and care, including medication and hospitalization at Gilliam Psychiatric Hospital. The level of care that has been provided to the Plaintiff is more than adequate from a professional standpoint.

. . .

11)     The Plaintiff has received, and continues to receive, adequate mental health care for his diagnosed disorder.

(Wood Aff. ¶¶ 7-11.) The medical records attached to Dr. Wood's Affidavit total nearly 100 pages. (See Wood Aff. Ex. A.) Frierson filed his Affidavit, as well as some medical records, along with his Motion for Summary Judgment. (See Dkt. No. 58.)

Defendants contend they are entitled to summary judgment because Dr. Wood's Affidavit and attached medical records make "it . . . clear . . . that the Defendants were not indifferent to the Plaintiff's medical needs, and that he has received constitutionally adequate treatment for his medical needs." (Dkt. No. 37-1 at 3 of 19.) Defendants and Frierson contend summary judgment in their favor is appropriate because "[t]he Plaintiff has been provided with medication, access to counselors, and even in-patient level care at Gilliam Psychiatric Hospital when needed." (Id. at 7; see also Dkt. No. 58-1 at 9 of 20.)

In his Response in Opposition to Defendants' Motion for Summary Judgment, Plaintiff disputes Defendants' contention that Plaintiff "has received and is receiving copious amounts of mental health care from mental health providers." (Dkt. No. 54-1 at 5 of 9.) According to Plaintiff, "state's exhibit A page 36, encounter 247[] clearly shows on the record the date Plaintiff was removed from mental health by Doctor Ralph C. Pollock." (Id.) Plaintiff states that he was provided with anti-psychotic medication "then sporadically

5

2:12-cv-00305-PMD    Date Filed 01/07/13    Entry Number 61    Page 6 of 15

removed from the mediation due to complaints about the side effects he experienced." (Id. at 6 of 9.) Plaintiff complains that the medication he receives "now is not prescribed by SCDC's mental health program" but is instead prescribed by SCDC's medical staff "and they are anti-psychotic/pain medications." (Id.) Plaintiff contends that he "has not spoken with or seen any mental health counselors since his removal from mental health status." (Id.) Plaintiff states, "It was obvious that a particular treatment was required and the Defendants working in cahoots deliberately chose not to provide that required treatment." (Id.) Plaintiff contends that because he "is a known self-mutilator and . . . has attempted suicide numerous times while housed within SCDC and before his SCDC incarceration, he should've been a participant in the mental health 'Cutters Program' like several of his prisoner-peers whom [Plaintiff] has conversed/congregated with." (Id. at 8 of 9.) Plaintiff attached declarations of several inmates to his Response in Opposition. (See Dkt. No. 54-2 at 14-18 of 64.)[2]

It appears undisputed that Plaintiff has previously engaged in self-mutilating behavior and attempted suicide on more than one occasion. Plaintiff contends that the mental health care he has received is constitutionally inadequate; the undersigned disagrees. Plaintiff begins his Complaint with the allegation that on October 20, 2010, he attempted suicide by mutilating his own left wrist. (Dkt. No. 1 at 3 of 7.) According to Plaintiff's medical records, Dedric Williams, a Human Services Coordinator with SCDC, saw Plaintiff that same day, and although Plaintiff was crying and yelling, Plaintiff refused to speak to Williams. (Dkt. No. 37-5 at 13-14 of 25.) Williams placed Plaintiff on Crisis Intervention ("CI"). (Id.; see also

---

[2]Some of these declarations concern alleged actions of Sergeant Lawless and Lieutenant Church. (See Dkt. No. 54-2 at 43-46 of 64.) Neither Lawless nor Church is a party in the instant action, so this evidence is not relevant because in a § 1983 action, "liability is personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001).

Compl. at 3 of 7.) When Plaintiff continued to refuse to speak to Williams, Williams continued Plaintiff on CI. (Dkt. No. 37-5 at 12-13 of 25.) Defendant Gordon saw Plaintiff on October 26, 2010, and the medical records indicate Plaintiff reported a strong suicidal ideation as well as auditory and visual hallucinations. (Id.) Defendant Goodson recommended extending Plaintiff on Crisis Intervention for seven days and referred Plaintiff for further treatment. (Id.; see also Compl. at 3 of 7.)

Nurse Practitioner Delany, who works in psychiatry, saw Plaintiff on October 28, 2010. (Dkt. No. 37-5 at 12 of 25.) Plaintiff cried throughout Defendant Delany's interview and reported thinking of suicide "constantly." (Id.) Delany's record for that day states, "Since IM states he will not take meds and is feeling hopeless and suicidal, recommend commitment to GPH." (Id.) Charles Goodson's records for that day indicate the same–that Plaintiff will be sent to the psychiatric hospital. (Dkt. No. 37-5 at 11-12 of 25.) Plaintiff was admitted to GPH on October 29, 2010. (Dkt. No. 37-5 at 11 of 25; see also Compl. at 3 of 7.) Dr. Frierson, a physician board certified in psychiatry and forensic psychiatry, saw Plaintiff at GPH on November 2 and November 9 of 2010. (Frierson Aff. ¶¶ 4, 9-10.) Dr. Frierson describes his encounter of November 2 as follows:

> During that evaluation the Plaintiff was very vague in describing the problems from which he claimed to be suffering, and initially refused to cooperate with my evaluation. Furthermore, during that evaluation the Plaintiff denied any current suicidal or homicidal ideations or any other psychotic symptoms. In the latter half of the evaluation process, I noted that the Plaintiff's affect was quite bright, and that he became quite jovial, even joking with myself and my assistant at times. After a thorough psychiatric evaluation of the Plaintiff, I concluded that the Plaintiff's presentation did not require psychotropic medication, as he was not significantly depressed and his actions were more likely an effort to avoid being housed in lockup at Perry.

(Frierson Aff. ¶ 9.) Frierson saw Plaintiff again on November 9; Dr. Frierson states,

> At the time of that evaluation, the Plaintiff had again self-injured by cutting his arms. During that evaluation the Plaintiff indicated that he self-mutilated so that he would not be returned to Perry. I warned him about the presence of

7

Methicillin-resistant Staphylococcus aureus, commonly referred to as MRSA, in prison environments and the dangers of his self-inflicted wounds becoming infected. Despite his self-injurious behavior, the Plaintiff denied any homicidal or suicidal ideations. Based on that evaluation, I concluded that the Plaintiff's conduct was manipulative, and that there were no clinical findings that he was in fact suffering from any type of mood disorder.

(Id. ¶ 10.)

Plaintiff was discharged from GPH and returned to Perry on or about November 12, 2010. (See Dkt. No. 37-4 at 23 of 25.)[3] The record for Encounter 204 indicates that Plaintiff returned from GPH "with active problem adjustment disorder with disturbance of conduct" and antisocial personality disorder. (Dkt. No. 37-4 at 23 of 25.) Plaintiff saw mental health on November 16, 2010; the record for that encounter with Ms. Crawford indicates that Plaintiff was on no medication, that the "problems are behavioral in nature," and that she recommended discontinuing Plaintiff from mental health "unless evidence of true mental illness emerges." (Dkt. No. 37-4 at 22 of 25.)

Encounter 207 indicates that Williams saw Plaintiff on December 7, 2010, and placed Plaintiff back on Crisis Intervention after Plaintiff told Williams that he was "hearing voices to end it all." (Dkt. No. 37-4 at 21-22 of 25.) Plaintiff was seen in medical on December 7 with cuts on both of his forearms; when asked why he cut himself, Plaintiff stated that he wanted to die. (Dkt. No. 37-4 at 21 of 25.) Plaintiff was seen by mental health on December 8, 9, and 10 and was continued on Crisis Intervention. (Dkt. No. 37-4 at 20-21 of 25.) On December 13, 2010, Plaintiff was again seen by mental health; the records indicate Plaintiff denied any hallucinations but stated that he would like some medication "for his SI thought"

_____

[3]Plaintiff alleges in his Complaint that he was discharged from GPH on November 16, 2010. (Dkt. No. 1 at 3 of 7.) It appears, however, that Plaintiff was discharged before that date, as the records indicate Plaintiff was seen at sick call at PCI on November 15, 2010. (Dkt. No. 37-4 at 22 of 25.) The exact date Plaintiff was discharged from GPH is not material, but for purposes of the instant Report and Recommendation, the undersigned assumes Plaintiff was discharged on November 12, 2010.

8

and "to prevent him from harming someone else." (Dkt. No. 37-4 at 19 of 25.) That record further states, "IM stated that he don't feel like hurting himself but 'I need some medication,'" and that Plaintiff was removed from CI and to be monitored by mental health. (Dkt. No. 37-4 at 19 of 25.)

Plaintiff was seen by mental health on December 14 at the mental health clinic; records of that encounter indicate that Plaintiff complained that SCDC was not meeting his mental health needs and that he needed medication. (Dkt. No. 37-4 at 19 of 25.) Wilson's notes state, "It is my impression that IM continues to manipulate to try and get needs met. IM has been seen by Dr. Frierson and Dr. Crawford and no meds were given." (Id.) Wilson saw Plaintiff again on December 20, 2010. (Dkt. No. 37-4 at 18 of 25.) It appears that Plaintiff attempted to hang himself that same day: on December 20, 2010. (Id.) Plaintiff reported hearing voices that told him to kill himself; the notes for Encounter 221 state that Plaintiff "will be transported to GPH immediately." (Id.) Notes from December 21, 2010 indicate that Perry staff called Defendant Page at GPH; Page said that GPH would not accept Plaintiff at that time but to keep Plaintiff on CI status. (Id.) Plaintiff was seen by mental health on December 21, 22, 23; on December 23, Plaintiff was taken off CI when he signed a "no self harm contract." (Dkt. No. 37-4 at 17-18 of 25.)

Plaintiff was seen by Defendant Delany in the mental health clinic on January 6, 2011. (Dkt. No. 37-4 at 16 of 25.) According to Delany's notes, Plaintiff admitted he refused "help in GPH because they made everyone 'zombies,'" but that Plaintiff now "states that he is willing to accept medication." (Id.) Plaintiff was given a prescription for Geodon. (Id.) Plaintiff was seen by mental health again on January 12, 2011; when asked about whether the medication was working, Plaintiff stated the medication "made him feel sleepy." (Dkt. No. 37-4 at 16 of 25.)

Plaintiff was seen by mental health again on February 7, 2011. (Dkt. No. 37-4 at 15 of 25.) The notes indicate that Plaintiff complained the medication was not working and "made him feel bad," and that he still hears voices. (Id.) Plaintiff was placed on the list for the psych clinic. (Id.) Plaintiff was seen by mental health on March 3, 2011. (Dkt. No. 37-4 at 14 of 25.) Plaintiff denied any hallucinations and indicated his eating and sleeping patterns were regular. (Id.) Plaintiff did complain that he felt his medication "wears off" and that he needed a higher dosage. (Id.) Notes for March 3 indicate that Plaintiff was to "be followed by mental health in 30 days as per policy for signs of decompensation." (Id.)

On April 1, 2011, Plaintiff was seen by mental health; Plaintiff denied any hallucinations, reported that he was taking his medication, and stated that the medication was no longer making him sleepy. (Dkt. No. 37-4 at 13 of 25.) Defendant Pollock saw Plaintiff on April 27, 2011; Plaintiff reported he was not doing well and that the Geodon "makes 'my eyes feel like sand.'" (Dkt. No. 37-4 at 12 of 25.) Dr. Pollock discontinued the medication due to side effects; Dr. Pollock noted that Plaintiff avoided answering Dr. Pollock's questions and that it was "very unlikely that [Plaintiff] has any psychotic symptoms." (Id.)

Plaintiff was seen by mental health on May 11, 2011; he had been placed on CI the night before when he made a statement during an altercation that he was going to "cut up." (Dkt. No. 37-4 at 11 of 25.) Plaintiff was taken off CI status when he explained that he had no intent on hurting himself and that he "meant cut up as in act out." (Id.) When seen by mental health on May 19, 2011, he complained that Dr. Pollock removed him from his medication and stated that he continues to hear voices. (Id.) When seen by mental health on May 23, 2011, he again complained about being "pulled off his medication" and stated that he "feels . . . he needs his medication back." (Id) Plaintiff asked to see Defendant

10

Delany on the next psych clinic but "was informed that he will not be able to be placed on list at this time." (Dkt. No. 37-4 at 10 of 25.)

Plaintiff attempted suicide again on June 8, 2011, and was transported to an emergency room. (Dkt. No. 37-4 at 9-10 of 25.) Back at Perry on June 9, Plaintiff pulled out the stitches he received the night before and threatened to do it again if he did not get a blanket. (Dkt. No. 37-4 at 9 of 25.) When seen by mental health on June 9, Plaintiff complained about his medication being removed; Plaintiff was informed that he was on the schedule for the psych clinic. (Id.) An emergency in-house note dated June 10 indicates that Plaintiff cut both forearms. (Dkt. No. 37-4 at 8 of 25.) The wounds were cleaned and Plaintiff was continued on CI. (Id.) Plaintiff was again sent to GPH on June 10. (Dkt. No. 37-4 at 7 of 25.)

At GPH Plaintiff was placed on suicide precautions. (Dkt. No. 37-4 at 4 of 25.) Dr. Frierson saw Plaintiff at GPH on June 14, 2011. (Dkt. No. 37-4 at 2 of 25.) Dr. Frierson's notes state,

> IM is describing atypical symptoms of a psychotic disorder. He is most likely feigning symptoms for secondary gain given that he is on lock-up in Perry. His mood is depressed although he appears euthymic. Is asking to come off S/P because it is too cold. Will take off S/P. Hygine is good, no objective evidence of mood of psychotic disorder. . . No SI/HI.

(Dkt. No. 37-4 at 2 of 25.) Plaintiff was discharged from GPH on June 22. (Dkt. No. 37-3 at 23 of 25.)

Back at Perry, Plaintiff continued to see mental health; he saw mental health again on June 23; June 28; July 6; July 12; July 21; July 22; August 11; and September 7 of 2011. (See Dkt. No. 37-3 at 18-22 of 25.) Notes from September 7, 2011 reveal that the Plaintiff would "be followed by mental health as per policy and monitored for signs of decompensation"; the notes also indicate that a discharge from mental health was pending. (Dkt. No. 37-3 at 18 of 25.) When Plaintiff was seen at sick call on October 3, 2011, Plaintiff

11

requested to be seen by mental health "because he is hearing voices." (Dkt. No. 37-3 at 16 of 25.) He was referred to mental health for review. (Id.)

Plaintiff cut his wrists again on October 7, 2011. (Dkt. No. 37-3 at 15-16 of 25.) The wounds were cleaned and Plaintiff was placed back on CI. (Id.) Plaintiff's medical records reveal that mental health continued to monitor Plaintiff; a record dated November 11, 2011 indicates that Plaintiff "was given the SIMS test and the score indicated a strong probability of malingering." (Dkt. No. 37-3 at 8 of 25.)

As noted above, Plaintiff contends Defendants were deliberately indifferent to his serious medical needs. The undersigned disagrees; the evidence in the record shows that Plaintiff has been continuously evaluated by mental health professionals, both at Perry and GPH. During the time period in question, Plaintiff was placed on Crisis Intervention time after time, and he was sent to Gilliam Psychiatric Hospital for inpatient stays at least twice. Various Defendants diagnosed Plaintiff as malingering and having no psychotic disorder. Clearly Plaintiff disagrees with this diagnosis, but such disagreement does not equal deliberate indifference. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) ("Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged."); United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) ("Although an inmate certainly has a right to necessary medical treatment, he does not have a right to demand that the opinion of his pre-imprisonment doctor be permitted to override the reasonable professional judgment of the prison's medical team.").[4] To the extent Plaintiff argues that–because his alleged medical problem remains–Defendants have been deliberately indifferent, that argument

---

[4]Moreover, it is well settled that negligence is not actionable under § 1983. See Daniels v. Williams, 474 U.S. 327, 328 (1986); Whitley v. Albers, 475 U.S. 312, 319 (1986); Pink v. Lester, 52 F.3d 73, 78 (4th Cir. 1995) ("The district court properly held that Daniels bars an action under § 1983 for negligent conduct. . . . ").

12

must be rejected, as the Constitution does not mandate a cure. See, e.g., Armour v.

Herman, 1:05-CV-295-TLS, 2005 WL 2977761, at *3 (N.D. Ind. Nov. 4, 2005) (holding "[t]he

Eighth Amendment does not require medical success...."); Ramos v. Artuz, No. 00 Civ.

0149(LTS), 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (indicating that an

unsuccessful course of treatment does not support a finding of deliberate indifference). In

light of the record before this court, no reasonable jury could conclude that any of the

Defendants were deliberately indifferent to Plaintiff's serious medical needs. Accordingly,

the undersigned recommends granting Frierson's Motion for Summary Judgment (Dkt. No.

58) and granting Defendants' Motion for Summary Judgment (Dkt. No. 37.)[5]

---

[5]In light of the recommendation pertaining to the Motions for Summary Judgment, the undersigned recommends dismissing the following motions as moot: (a) Defendants' Motion to Stay Discovery (Dkt. No. 40); (b) Plaintiff's Motion to Compel (Dkt. No. 42); and (c) Plaintiff's Motion to Strike Defendants' Motion to Stay (Dkt. No. 43). In his Motion to Compel, Plaintiff points to Defendant Wood's Affidavit stating that Plaintiff continues to receive mental health treatment, and argues that he needs the at-issue discovery to prove that he is not receiving mental health treatment. (Dkt. No. 42 at 2 of 2.) Defendants attached all of Plaintiff's relevant medical records to their Motion for Summary Judgment. (See generally Dkt. No. 37.) Moreover, the allegations in Plaintiff's Complaint generally match the information in Plaintiff's medical records. (See Dkt. No. 1; Dkt. No. 37.) In fact, it appears that few facts in the case sub judice are disputed; the dispute centers on whether these facts constitute deliberate indifference, and the undersigned concludes that they do not. Accordingly, these pending motions should be dismissed as moot. See Wright v. Bearden, No. 1:11–3307–TLW–SVH, 2012 WL 4513862, at *3 (D.S.C. Aug. 21, 2012) (adopted at 2012 WL 4511189 (D.S.C. Oct. 2, 2012)).

## **CONCLUSION**

Wherefore, it is RECOMMENDED that the Motion for Summary Judgment filed by Defendants Delany, Woods, Gordon, Page, Miller, and Pollock (Dkt. No. 37) be GRANTED. It is further RECOMMENDED that Defendant Frierson's Motion for Summary Judgment (Dkt. No. 58) be GRANTED. It is also RECOMMENDED that all remaining motions (Dkt. No. 40, Dkt. No. 42, and Dkt. No. 43) be DISMISSED as moot.

IT IS SO RECOMMENDED.


                                            s/Bruce Howe Hendricks
                                            United States Magistrate Judge

January 7, 2013
Charleston, South Carolina


**The plaintiff's attention is directed to the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).